Lee A. Greenwood
Christopher M. Colorado
Brian A. Kudon
David F. Benson\*
**Attorneys for Plaintiff**
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY  10004-2616
212-336-9143 (Colorado)
ColoradoCh@sec.gov

*\*Pro Hac Vice Application Forthcoming*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>   -against-<br><br>JIAN WU,<br><br>        Defendant. | **COMPLAINT**<br><br>1:25 Civ. 07573<br><br>JURY TRIAL DEMANDED |

    Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant Jian Wu ("Wu"), alleges:

### INTRODUCTION

    1.  From 2021 to 2023, Jian Wu, a former employee of Two Sigma Investments, LP ("TSI"), orchestrated a scheme to deceive his employer and reap millions of dollars in ill-gotten gains by manipulating computer-based algorithmic investment models ("Models") that TSI and its affiliate, Two Sigma Advisers, LP ("TSA," and, together, "Two Sigma"), used to make investment decisions for their clients, including decisions to buy and sell securities.

1

2. Two Sigma developed and relied on Models to generate predictions and trading signals for securities prices, which it aggregated into "Consolidated Forecasts" that sought to predict the future performance of specific securities. Two Sigma then relied on Models and Consolidated Forecasts to decide whether to buy and sell securities for its advisory clients.

3. Two Sigma required that each new Model it developed and approved be sufficiently uncorrelated to, or "decorrelated" from, existing Models and Consolidated Forecasts to ensure that new Models generated unique forecasts that complimented, rather than duplicated, the firm's existing predictions. Two Sigma thus sought to increase the likelihood that new Models generated "alpha"—investment returns relative to the return of a relevant market benchmark—that was not already captured by its existing Models and Consolidated Forecasts.

4. In violation of Two Sigma's policies, between November 2021 and August 2023 (the "Relevant Period"), Wu secretly manipulated at least fourteen Models he created or helped create, making unauthorized and undisclosed changes to those Models to increase their correlation to the firm's other Models and Consolidated Forecasts. Thus, instead of generating the unique trading signals and forecasts that Two Sigma expected, Wu's manipulated Models effectively replicated the output of other Models and Consolidated Forecasts.

5. Wu misrepresented to Two Sigma that his Models fell below the firm's applicable correlation thresholds and were generating unique forecasts, deceiving Two Sigma into relying more heavily on them. Consequently, when it deployed Wu's Models, Two Sigma bought and sold securities for its clients in amounts, concentrations, and frequencies that differed from its intended strategies. Wu's secret Model changes caused certain Two Sigma clients to trade securities in a manner that caused harm to them of at least $165 million during the Relevant Period, which Two Sigma subsequently repaid.

6. Wu's scheme also caused Two Sigma to falsely believe that his Models were generating substantially more alpha not captured by the firm's other Models and Consolidated Forecasts than his Models actually generated, which caused Two Sigma to pay Wu millions of dollars in cash bonuses and performance grants during the Relevant Period that it would not otherwise have paid him.

7. Wu's unauthorized and undisclosed changes to his Models and misrepresentations to Two Sigma about his Models' correlations violated the antifraud provisions of the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act").

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

8. The Commission brings this action under the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and (d)] and Exchange Act Section 21(d) [15 U.S.C. §§ 78u(d)].

9. The Commission seeks a final judgment: (a) permanently enjoining Wu from violating the federal securities laws and rules this Complaint alleges he has violated; (b) ordering Wu to disgorge all ill-gotten gains he received as a result of the violations alleged here and to pay prejudgment interest thereon, under Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Wu to pay civil money penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Wu from, directly or indirectly, acting as, or being associated, with any investment adviser, under Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

11. Wu, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

12. Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa]. Wu transacted business in this District during the Relevant Period. In addition, certain of the transactions, acts, practices, and courses of business alleged in this Complaint occurred within this District, including because Two Sigma, where Wu was employed and to which Wu made materially false and misleading statements, had offices located in this District to which Wu was assigned.

## DEFENDANT

13. **Jian Wu**, age 34, is a permanent legal resident of New York, NY, and a citizen of China. He holds Ph.D.'s in Industrial Engineering and Operations Research from the University of Southern California and Cornell University, respectively. Wu was employed by TSI from April 2018 to August 2023, holding various positions, including quantitative researcher, vice president, and senior vice president.

## RELEVANT NON-PARTY ENTITIES

14. **TSI** is a Delaware limited partnership headquartered in New York, NY. TSI was founded in July 2001 and has been registered with the Commission as an investment adviser since August 2009. TSI provides advisory services on a discretionary basis to various clients, including

private investment funds. According to its Form ADV dated July 25, 2025, TSI had regulatory assets under management of more than $110 billion.

15. **TSA** is a Delaware limited partnership headquartered in New York, NY. TSA was founded in December 2001 and has been registered with the Commission as an investment adviser since February 2010. TSA provides advisory services on a discretionary basis to various clients, including private investment funds, a registered investment company, foreign funds, and separately managed accounts ("SMAs"). According to its Form ADV dated July 25, 2025, TSA had regulatory assets under management of more than $74 billion.

## STATEMENT OF FACTS

### I. Two Sigma's Model Development and Approval Process

16. During the Relevant Period, TSI developed Models and then licensed those Models to TSA. Both TSI and TSA used Models and Consolidated Forecasts to make investment decisions for their clients, including buying and selling equity securities listed on exchanges such as the New York Stock Exchange.

17. Two Sigma required new Models and changes to existing Models to be sufficiently distinct from its other Models and Consolidated Forecasts, such that new or modified Models were likely to generate alpha not already captured by the firm's other Models or Consolidated Forecasts.

18. During the Relevant Period, Two Sigma's process for developing and approving new Models or Model changes was described in its "Productionalize a Model" ("PAM") manual, which set forth the steps Two Sigma required before approving a new Model or Model change (referred to collectively as the "PAM process").

19.     As part of the PAM process, Two Sigma required modelers to submit Model proposals or proposed Model changes through an internal system called "TOM."  These required submissions included detailed information about the Model proposal, such as its expected correlation to existing Models and Consolidated Forecasts based on simulations run on historical securities trading data.

20.     Two Sigma also required the lead modeler for each Model to certify that the information submitted with the TOM proposal, including all Model inputs, was accurate and complete.

21.     Two Sigma management then reviewed the TOM submissions and generally approved only new Models or Model changes that met specific criteria, including a sufficient lack of correlation to the firm's existing Models and Consolidated Forecasts.

22.     Once a new Model or Model change was approved, Two Sigma's portfolio management teams determined how to incorporate the Model into the firm's investment strategies for their advisory clients.

23.     By following the PAM process, Two Sigma aimed to maintain an uncorrelated set of Models that would generate unique investment returns, thereby enhancing the overall performance of its advisory clients' investments.

## II.     Two Sigma's Storage and Management of Model Code

24.     After approving a Model or Model change and releasing it for live trading, Two Sigma stored the Model's core code in a secure file known as the "Jar."

25.     To maintain control over its Models, Two Sigma limited Jar access to a select group of engineering employees that were authorized to modify Model code.

26. Consequently, modelers, including Wu, could not access the Jar and, thus, could modify a Model's code only through the PAM process. This restriction was intended to ensure that all changes to Model code were subject to review and approval before the changes were implemented into Models that had already been released for live trading.

27. By no later than 2019, Two Sigma's Models grew in complexity to the point that they exceeded the Jar's storage capacity, leading the firm to store certain Model "parameters" in a separate database called "celFS." Parameters are variable inputs that impact a Model's forecasts of a security's performance.

28. Some Two Sigma modelers, including Wu, stored parameters for their Models in celFS and then linked those parameters to the Model code stored in the Jar, enabling the Model to operate using parameters stored outside the Jar.

29. One critical parameter that some modelers, including Wu, stored in celFS was the "Decorrelation Parameter," which sought to adjust a Model's correlation to other Models and Consolidated Forecasts. As a general matter, the Decorrelation Parameter was inversely related to the expected correlation: as the parameter's value decreased, a Model's expected correlation to other Models and Consolidated Forecasts increased, and vice versa.

30. Two Sigma used Decorrelation Parameters to ensure that, consistent with the PAM process, each Model remained sufficiently uncorrelated from other Models and was likely to generate alpha not already captured by those other Models.

31. For Two Sigma, the Decorrelation Parameter was important to preventing redundancy among its Models, which could lead to unintended trading activity, such as the firm buying or selling securities on behalf of its clients in different amounts, concentrations, and frequencies than it intended.

32. During the Relevant Period, celFS had vulnerabilities that enabled modelers to make unauthorized changes to Model parameters stored in celFS which, in turn, altered the securities forecasts those Models generated.

33. Before June 2022, although prohibited by Two Sigma's policies and procedures, Two Sigma modelers could directly access and modify parameters in celFS, thus bypassing the required PAM process.

34. In June 2022, Two Sigma introduced a ticket system for changing celFS parameters, requiring modelers to submit written requests that were then implemented by Two Sigma engineers. However, because engineers implemented ticket system changes without substantively reviewing the requests or ensuring management approval, modelers could also use the ticket system to circumvent the required PAM process.

### III.     Wu Created Multiple Models for Two Sigma.

35. As a modeler at Two Sigma, Wu received training on the firm's policies and procedures for developing Models, created and submitted multiple Models for approval, and understood the importance of decorrelation in the Model approval process.

#### A.     *Two Sigma Trained Wu on Model Development.*

36. In April 2018, TSI hired Wu as a quantitative researcher to develop Models that generated forecasts of securities' future performance.

37. As part of his onboarding, Wu received training on Two Sigma's Model development policies and procedures, including the PAM process, which emphasized the importance of decorrelation between Models.

38. Wu's direct supervisor ("Supervisor A") also provided Wu with guidance on Model development, the PAM process, and Two Sigma's policies and procedures.

39. Additionally, Two Sigma provided Wu with an employee handbook outlining the firm's policies and procedures, including the PAM process.

40. From 2019 to 2023, Wu annually certified that he had received, reviewed, and understood specific "key documents," including the employee handbook, and acknowledged his responsibility to comply with all of Two Sigma's policies and procedures.

41. Throughout the Relevant Period, Wu understood that decorrelation was a critical aspect of Two Sigma's model approval process, and that the firm would only approve a proposed Model or Model change that did not exceed specific correlation thresholds relative to other Models and the Consolidated Forecasts.

**B.**     *Wu Knew That His Compensation Was Tied to Model Performance.*

42. Wu was aware that Two Sigma used his Models to buy and sell publicly-traded equity securities, among other securities, on behalf of its advisory clients.

43. As Wu also knew, his annual incentive compensation, including cash bonuses and performance grants, was tied to his Models' performance, and his compensation was based in part on his Models' ability to generate unique investment returns that were uncorrelated to the firm's other Models and Consolidated Forecasts.

44. During the Relevant Period, Two Sigma provided Wu with access to periodic reports concerning how each of his Models that were being used to trade securities for Two Sigma's clients were performing. These reports included the profits and losses attributable to each of his Models, as well as other metrics, which enabled Wu to monitor his Models' performance on a near-daily basis.

45. Wu used these periodic reports to assess his Models' performance and to justify requests he made to his supervisors for increased bonus compensation.

### C.  *Wu Created At Least Fourteen Models for Two Sigma.*

46. Between 2019 and 2023, Wu created or helped to create at least fourteen new Models (including Models A through N), which were submitted for approval through the PAM process.

47. Wu's Models generated predictions and trading signals for securities, including primarily for buying and selling U.S. equity securities listed on exchanges such as the New York Stock Exchange.

48. In designing these Models, Wu linked a Decorrelation Parameter stored in celFS to each Model's code and set the Decorrelation Parameter at a value necessary to satisfy Two Sigma's correlation tests required by the PAM process.

49. When Wu submitted his Models to Two Sigma for approval, he certified, among other things, that he was providing the complete, accurate, and final version of each Model.

50. From August 2021 to December 2022, Wu submitted written attestations for at least nine proposed new Models, affirming that each was "accurate and complete, including all the information in the Model Inputs section" and that he had "followed research and simulation best practices."

51. For example, Wu submitted such attestations when seeking approval for Models A, B, and C on or about April 20, 2021, October 25, 2021, and March 4, 2022, respectively.

52. At Two Sigma, "simulation best practices" meant that a modeler was submitting their best and final proposed Model for review, without intending to make further changes.

53. Starting in March 2022, Wu also submitted written attestations for at least two proposed Models affirming that each was the "finalized version of the Model, [and is] exactly

how the [M]odel will behave [if it is approved and released for trading]. . . . This includes (but is not limited to): . . . Model decorrelation."

54. Wu submitted these attestations when seeking approval for Models C and E on or about March 4, 2022 and May 9, 2022, respectively.

55. However, Wu's attestations were false when made, as he intended to, and did, alter the Models from the versions submitted for approval by changing their Decorrelation Parameters.

### IV.   Wu Engaged in a Scheme to Manipulate His Models.

56. Wu manipulated at least fourteen of his Models by secretly reducing the Decorrelation Parameters stored in celFS that were submitted to and approved by Two Sigma management. This manipulation caused his Models to essentially replicate the outputs of Two Sigma's other Models and Consolidated Forecasts. As a result, Wu deceived Two Sigma about his Models' true characteristics, caused Two Sigma to engage in securities trades that harmed certain advisory clients, and enriched himself by millions of dollars.

#### A.   *Wu Secretly Changed the Decorrelation Parameters for His Models.*

57. Beginning in November 2021, Wu secretly altered the Decorrelation Parameters for at least fourteen of his Models, reducing their decorrelation with (and thus increasing their correlation to) Two Sigma's other Models and Consolidated Forecasts.

58. As Two Sigma modelers, including Wu, understood from information they received from the firm, any single Model was unlikely to outperform the firm's Consolidated Forecasts. By reducing the Decorrelation Parameters, Wu more closely aligned his Models' performance with the Consolidated Forecasts, creating the false impression of his Models' true performance and contributions to the profits and losses in Two Sigma's clients' accounts.

59. Wu made these unauthorized changes to his Models without Two Sigma's knowledge or approval, circumventing the PAM process. He often did so by submitting a Model version with a specific Decorrelation Parameter in the PAM process for Two Sigma's review, only to secretly modify the Decorrelation Parameter in celFS to a significantly lower value than he had represented, around the same time.

60. As a result of Wu's unauthorized changes, his Models more closely mirrored forecasts generated by other Models and Consolidated Forecasts, rather than generating unique forecasts. This increased the risk that Two Sigma would make unintended investment decisions, such as over-concentration in, or over-exposure to, particular securities.

61. Before June 2022, Wu altered Decorrelation Parameters directly in celFS for at least ten Models, without disclosure to or approval from Two Sigma. In fact, Wu reduced these Decorrelation Parameters to zero or near zero, effectively disabling Two Sigma's safeguard for preventing his Models from mirroring other Models and Consolidated Forecasts.

62. For example, Wu secretly changed the Decorrelation Parameter for Model A on two occasions: on November 15, 2021, he reduced the parameter to less than one percent of its approved value; on December 25, 2021, he reduced the parameter to zero. On both occasions, Wu made these changes directly in celFS without Two Sigma's knowledge or approval.

63. After June 2022, Wu used the ticket system to make unauthorized changes to the Decorrelation Parameter for four other Models, secretly reducing them to nearly zero by submitting ticket requests to replace the celFS files that were part of his requests for Model approval with new celFS files containing much smaller Decorrelation Parameter values.

64. For example, the below chart illustrates Wu's manipulation of the Decorrelation Parameters for Models B, F, and H. In each case, Wu represented one Decorrelation Parameter

to Two Sigma for approval, but then secretly added two zeros to the parameter value in a new celFS file, effectively reducing those parameters by a factor of 100:

| Model | Decorrelation Parameter Submitted to PAM Process | Wu's Unauthorized Modified Parameter |
|---|---|---|
| B | 0.00661221 | 0.0000661221 |
| F | 0.00473471 | 0.0000473471 |
| H | 0.00661221 | 0.0000661221 |

65. By making these kinds of visually subtle (but quantitatively significant) adjustments to the parameters, Wu attempted to conceal his actions, underscoring the deceptive nature of his scheme.

66. Wu's manipulation of the Decorrelation Parameters rendered his statements to Two Sigma about his Models false and misleading; he represented that the versions of his Models that were submitted for approval were complete and accurate when, in fact, he intended to, and did, change the Decorrelation Parameters without disclosing those changes or obtaining approval for them.

    B.  *Wu Benefitted From—and Then Attempted to Hide—His Scheme.*

67. Wu's secret and deceptive modifications to the Decorrelation Parameters for his Models were motivated by a desire to increase his incentive compensation, which was directly tied to the performance of his Models in generating profits for Two Sigma's clients.

68. By manipulating the Decorrelation Parameters, Wu artificially inflated the apparent contribution of his Models to Two Sigma's clients' profits. Two Sigma then paid Wu millions of dollars of compensation based on these inflated contributions.

69. Following Wu's manipulation of Decorrelation Parameters beginning in November 2021, his incentive compensation for 2022 increased substantially. TSI awarded Wu

more than $23 million for 2022, which consisted of a $16 million cash bonus and more than $7 million in performance grants.

70. Indeed, Wu's 2022 compensation exceeded three times the total compensation he had received since joining TSI in April 2018.

71. The below chart summarizes Wu's compensation by year:

| Year | Salary | Cash Bonus | Performance Grants | Total |
|---|---|---|---|---|
| 2018 | $128,077 | $286,678 | $0 | $414,755 |
| 2019 | $193,000 | $307,000 | $0 | $500,000 |
| 2020 | $200,000 | $2,600,000 | $1,400,000 | $4,200,000 |
| 2021 | $225,000 | $1,775,000 | $750,000 | $2,750,000 |
| 2022 | $259,000 | $16,000,000 | $7,250,000 | $23,509,000 |

72. TSI was unaware of Wu's unauthorized changes to Decorrelation Parameters when it issued his incentive compensation for the years 2021 and 2022. Although TSI ultimately cancelled Wu's performance grants for these years after his termination, it has not recovered any portion of the nearly $18 million in cash bonuses it paid Wu for those years.

73. Wu's scheme began to unravel in January 2023, when TSI discovered an anonymous social media post revealing that a TSI employee had received over $23 million in compensation for 2022, prompting an investigation into Wu's Models.

74. As TSI investigated, it found that Wu's Models exhibited unusually high correlations to other Models and Consolidated Forecasts. When questioned about his Models' performance, Wu failed to disclose the unauthorized changes he had made to the Decorrelation Parameters, instead blaming the high correlations on other factors, such as market conditions or the performance of other Models.

75. Upon learning of TSI's investigation, Wu attempted to conceal his wrongdoing by making additional unauthorized changes to the Decorrelation Parameters for his Models in order to reverse his earlier changes.

76. For example, on July 29, 2023, Wu reverted the Decorrelation Parameters for Models A, B, D, and E to the values that Two Sigma had originally approved in 2021 or 2022.

77. In August 2023, Wu admitted to Supervisor A and other TSI employees that he had reduced the Decorrelation Parameters without approval, leading to his placement on administrative leave and subsequent termination in January 2024 (which was effective as of August 2023).

78. TSI's investigation concluded that Wu's manipulation of the Decorrelation Parameters created a false impression that his Models generated more unique and profitable investment returns than they actually did, resulting in Two Sigma making unintended purchases and sales of securities on behalf of its clients and causing harm to many clients.

79. In December 2023 and January 2024, Two Sigma voluntarily repaid its negatively impacted client funds and SMAs, which primarily included outside investors, approximately $165 million.

**FIRST CLAIM FOR RELIEF**
**Violations of Securities Act Section 17(a)**

80. The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 79.

81. Wu, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (i) knowingly or recklessly has employed one or more devices, schemes

15

or artifices to defraud, (ii) knowingly, recklessly, or negligently has obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

82.     By reason of the foregoing, Wu, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Section 17(a)(1)-(3) [15 U.S.C. §§ 77q(a)(1)-(3)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

83.     The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 79.

84.     Wu, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

85. By reason of the foregoing, Wu, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(a)-(c) thereunder [17 C.F.R. § 240.10b-5(a)-(c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Wu and his agents, servants, employees and attorneys and all persons in active concert or participation with him, from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by committing or engaging in specified actions or activities relevant to such violations;

### II.

Ordering Wu to disgorge all ill-gotten gains he received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, under Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

### III.

Ordering Wu to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

### IV.

Permanently prohibiting Wu from, directly or indirectly, acting as or being associated with any investment adviser, under Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]. For purposes of this paragraph, a person

is associated with an investment adviser if such person is a partner, officer, or director of such investment adviser (or performs similar functions), or directly or indirectly controls or is controlled by such investment adviser, including any employee of such investment adviser; and

## V.

Granting any other and further relief this Court may deem just and proper.

## JURY DEMAND

The Commission demands a trial by jury.

Dated: New York, New York
September 11, 2025

/s/ Christopher M. Colorado
Lee A. Greenwood
Christopher M. Colorado
David F. Benson*
Brian A. Kudon
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
212-336-9143 (Colorado)
ColoradoCh@sec.gov

*Pro Hac Vice Application Forthcoming*